UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PATTI A. JONES,

                              Plaintiff,           11-CV-445(MAT)

             v.                                    **DECISION**
                                                   **and ORDER**
CAROLYN W. COLVIN, Commissioner
of Social Security,

                              Defendant.

_____

### INTRODUCTION

Plaintiff Patti A. Jones ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. Nos. 10 and 18.

In her motion, Plaintiff alleges that the decision of an Administrative Law Judge ("ALJ") was erroneous and not supported by the substantial evidence contained in the record and seeks reversal

_____

[1] Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

of the ALJ's decision. In the alternative, Plaintiff requests the Court to remand the action to the Commissioner for further proceedings. Dkt. No. 11.

The Commissioner also moves for judgment on the pleadings on grounds that the ALJ's decision was correct, was supported by substantial evidence, and was made in accordance with applicable law. Dkt. No. 19. For the following reasons, the Commissioner's motion is granted, and Plaintiff's motion is denied.

## BACKGROUND

On February 2, 2007, Plaintiff filed applications for DIB and SSI alleging that she was disabled beginning August 30, 2005, due to a learning disability, depression, migraine headaches, and back pain. After her applications were denied on May 8, 2007, Plaintiff requested a hearing before an ALJ. T. 39-44, 49-51, 69-80, 101.[2]

Following a hearing, the ALJ issued a written decision on March 3, 2009, finding that Plaintiff was not disabled within the meaning of the Act.[3] T. 12-25.

---

[2] Numerals preceded by "T." refer to pages from the transcript of the administrative record, submitted by Commissioner as a separately bound exhibit in this proceeding.

[3] For purposes of the Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).

The ALJ's decision became the Commissioner's final determination on March 25, 2011, when the Appeals Council denied Plaintiff's request for review. T. 1-4. Plaintiff then filed this action on May 24, 2011 for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g), and the parties now move for judgment on the pleadings under Fed.R.Civ.P. 12(c). Dkt. Nos. 1, 10, 18.

In applying the five-step sequential analysis for evaluating a claimant's application for Social Security benefits, as set forth in the administrative regulations promulgated by the SSA,[4] the ALJ found that Plaintiff was not working since the alleged onset date (step one); suffered the following severe impairments: major depressive disorder, mild; anxiety disorder, not otherwise specified; and passive dependent personality disorder; and also found that her complaints of daily migraine headaches and occasional back pain were not severe (step two). T. 17-18. He determined that Plaintiff's impairments did not meet or equal one of the listed impairments (step three). T. 18-20. The ALJ then determined that Plaintiff had an essentially unlimited residual function capacity ("RFC") to sit, stand, walk, lift, carry, push, and pull without limitation, with non-exertional limitations regarding her ability to understand, remember, and carry out

---

[4] See 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps).

complex and detailed tasks, and occasionally interact with the general public. Plaintiff had no limitations in her ability to interact with co-workers and supervisors. T. 20. The ALJ also found that Plaintiff was unable to perform her past relevant work as a motel housekeeper (step four), but could perform other work in the economy, based on her age, education, work experience, and RFC (step five). T. 24.

The ALJ adopted the opinion of consultive examiner Dr. Meng, who found that Plaintiff had no physical limitations. T. 22. Likewise, a State Agency Disability Determination Service ("DDS") review physician opined that Plaintiff's dysthymic disorder resulted in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and she had no episodes of deterioration. T. 23.

The ALJ considered the opinion of consultive examiner Renee Baskin, Ph.D., who found that, although Plaintiff had medical/physical problems that might interfere with her ability to maintain a regular work schedule, she could also understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn a new task with supervision, make appropriate decisions, and relate adequately with others. Baskin determined that Plaintiff's psychiatric problems

should not be significant enough to interfere with her ability to function on a daily basis. T. 23.

The ALJ accorded limited weight to the opinion of Dr. Carl Roth, D.O., who said that Plaintiff could only perform "light duty" work, had a mild learning disability with depression that caused significant problems. Dr. Roth also said he was not sure how Plaintiff's back pain limited her, but she did not have limitations in standing, sitting, bending, and pushing. Dr. Roth noted that Plaintiff's overall mental functioning was stable to good. Plaintiff could occasionally lift and carry ten pounds, frequently lift and carry five pounds, stand and/or walk less than two hours per day, sit one hour per day, but could not push or pull with her upper extremities. The ALJ found Dr. Roth's statements as to Plaintiff's limitations inconsistent with objective findings or any significant physical impairment. T. 22.

The ALJ also discounted the opinion of social worker Valerie Nowak on the basis that she was not a medical doctor. Ms. Nowak found that Plaintiff had "fair ability to remember work-like procedures and good ability to understand, remember, and carry out very short and simple instructions." T. 23.

Finally, the ALJ rejected two opinions of plaintiff's disability by Dr. Gupta and Dr. McTernan as lacking support of reasonable signs and diagnoses, including imaging tests and also

because their opinions were based solely on Plaintiff's subjective statements. T. 23.

Plaintiff testified at her hearing that she has pain from her lower back to her middle back and sometimes "stabbing" pain in her right leg, and that pain is sometimes worse than others. She said she could stand for ten minutes, walk for 10 to 15 minutes, and sit for short periods of time. Her husband did most of the shopping and housework. Plaintiff stated she could lift a frying pan and half-gallon of liquid, but not a full gallon. Because of her headaches, Plaintiff needed to lay down in a dark room four to five times a week, that she could not bend, and the cold bothers her.

**RFC assessment.**

The ALJ found that although Plaintiff had impairments that are considered "severe" based on the requirements in 20 C.F.R. §§ 404.1520(B) and 416.920(b), she was not disabled within the meaning of the Act and was thus not entitled to DIB or eligible for SSI payments.


## DISCUSSION

### I.   Scope of Judicial Review

The Social Security Act provides that, upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g). Substantial

evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938), quoted in Richardson v. Perales, 402 U.S. 389, 401 (1971); see also Tejada v. Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999). The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts. Giannasca v. Astrue, No. 07-cv-341, 2011 WL 4445141, at *3 (S.D.N.Y. Sept. 26, 2011) (citing Rodriguez v. Califano, 431 F.Supp. 421, 423 (S.D.N.Y. 1977)).

Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try the case de novo or substitute its findings for those of the Commissioner. Richardson, 402 U.S. at 401; see also Cage v. Comm'r of Soc. Servs., 692 F.3d 118, 122 (2d Cir. 2012). The Court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. Vasquez-Ortiz v. Apfel, 48 F.Supp.2d 250 (W.D.N.Y. 1999) (quoting Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)).

However, the Court must first determine that the ALJ applied the correct legal principles before applying the substantial evidence standard. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Lugo v. Chater, 932 F.Supp. 497, 500-01 (S.D.N.Y. 1996)

(same).   "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted). Thus, the Commissioner's determination cannot be upheld when it is based on an erroneous view of the law, or misapplication of the regulations, that disregards highly probative evidence. See Grey v. Heckler, 721 F.2d 41, 44 (2d Cir. 1983); see also Johnson v. Bowen, 817 F.2d at 985 ("Failure to apply the correct legal standards is grounds for reversal.").

If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall review only the question of conformity with [the] regulations ...."); see Kohler, 546 F.3d at 265. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it. See Marquez v.

Colvin, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (citing DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides)).

In addition, it is the function of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant." Carroll v. Sec'y of Health and Human Svcs., 705 F.2d 638, 642 (2d Cir. 1983); cf. Cichocki v. Astrue, 534 Fed. Appx. 71, 75 (2d Cir. Sept. 5, 2013). "Genuine conflicts in the medical evidence are for the Commissioner to resolve," Veino, 312 F.3d at 588, and the court "must show special deference" to credibility determinations made by the ALJ, "who had the opportunity to observe the witnesses' demeanor" while testifying. Yellow Freight Sys. Inc. v. Reich, 38 F.3d 76, 81 (2d Cir. 1994).

## II.  Plaintiff's Medical History

### A.  Plaintiff's Primary Care Providers

The record contains treatment notes from Plaintiff's primary care providers Dr. Thomas McTernan and Dr. Carl Roth. T. 158-163. Plaintiff saw Dr. McTernan on February 21, 2005, complaining of diffuse pain in the left axilla, which started in her back and radiated around her side to her front. T. 159, 160. Dr. McTernan suspected nerve impingement and he ordered x-rays of Plaintiff's

cervical spine. T. 160. X-rays of Plaintiff's cervical spine on February 22, 2005, were normal. T. 167. X-rays of Plaintiff's thoracic spine on the same date showed very slightly decreased height of the T-10 vertebral body, suggesting a minimal compression fracture. T. 159, 167. The disc spaces and the rest of the vertebral body heights were normal and the spinous processes were normal. T. 167.

Dr. McTernan saw Plaintiff on March 7, 2005, to review the x-rays with her. T. 159. Dr. McTernan stated that the x-ray findings, showing the T-10 compression fracture, were consistent with nerve impingement, which he believed caused the radiating pain that Plaintiff described, and prescribed Motrin as needed. Id.

Plaintiff saw Dr. Roth on May 1, 2006, complaining of headaches over the past several weeks. T. 158. Dr. Roth prescribed Imitrex to rule out migraine headaches. Id. On November 7, 2006, Plaintiff visited the Emergency room complaining of headaches. T. 152-54. A CT-scan of Plaintiff's head was negative. T. 157, 164.

Plaintiff saw Dr. Roth on February 12, 2007. T. 158. Plaintiff stated that she had not felt well for the past two months and she did not want to leave the house or do anything. Id. Plaintiff was the primary caretaker for her bedridden mother. Id. Dr. Roth noted that Plaintiff had no specific physical complaints, and prescribed her Celexa. Id.

When Plaintiff returned to Dr. Roth on April 17, 2007, she complained only of migraine headaches T. 215. She stated that Imitrex had helped, but she had run out of it. Id. Dr. Roth increased Plaintiff's dose of Celexa. Id.

Plaintiff next saw Dr. Roth on May 24, 2007, for follow-up for her headaches. Id. She also complained of some continued back pain T. 215. Plaintiff had good range of motion of her cervical spine with some spasm and tenderness in the mid to low back. Id. Dr. Roth prescribed Maxalt and Meloxican. Id.

When Plaintiff returned to Dr. Roth on July 10, 2007, Plaintiff reported that Maxalt had been effective for her headaches. Id. Plaintiff complained of some pain in her lower back, which was worse when she woke up and improved when she moved around. Id. Dr. Roth noted pelvic tilt, leg discrepancy and positive straight leg raising. Plaintiff was given myofascial, active correction with good results. Id. Dr. Roth gave Plaintiff samples of Ultram. Id.

Plaintiff saw Dr. Roth on July 31, 2007, because she needed disability forms completed. T. 214. Dr. Roth was "uncertain how Plaintiff's back pain limited her," but noted that she had limitations standing/sitting and bending/pushing. Id. Dr. Roth stated that Plaintiff had a mild learning disability with depression. Id. However, he stated that Plaintiff's overall mental

functioning was stable, "perhaps good no sig[nificant] limitations." Id.

Dr. Roth completed a functional capacity assessment on July 31, 2007. T. 216. He stated that Plaintiff could occasionally lift and carry ten pounds and frequently lift and carry five pounds. Plaintiff could stand and/or walk less than two hours per day and sit for one hour per day. Id. Dr. Roth noted that pushing/pulling with the upper extremities would cause discomfort and fatigue. He indicated that Plaintiff would have to lie down or recline for three hours in an eight-hour period. Id.

On the same date, Dr. Roth completed a statement regarding Plaintiff's mental abilities, rating Plaintiff's abilities in fourteen categories. T. 217-18. Dr. Roth rated as fair Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. T. 218. Dr. Roth rated Plaintiff's ability in every other category as good (understanding, remembering, and carrying out very short and simple instructions; maintaining attention for extended periods of two-hour segments; working in coordination with or proximity to others without being unduly distracted; dealing appropriately with supervisors; and getting along with coworkers and peers). T. 217-18.

Plaintiff followed-up with Dr. Roth on September 17, 2007. T. 214. She complained of headaches and back pain, but stated that she was otherwise feeling okay. Id. Plaintiff was given myofascial, active correction with good results. Dr. Roth prescribed Tylenol No. 4. Id.

Plaintiff saw Dr. McTernan in March, May, June, July, August, September, October, November, and December 2008 and January 2009. T. 244-48. McTernan observed tenderness on palpation with muscle spasm during her March, 25, 2008 visit. T. 248. Plaintiff acknowledged that a large part of her back problem was due to her weight. T. 247. Dr. McTernan noted that weight loss would take some strain and pressure off Plaintiff's back. Id. Dr. McTernan also attributed Plaintiff's back pain to a compression fracture at T-10. T. 245. Dr. McTernan's treatment notes show that Plaintiff was doing well with weight loss. T. 244, 246, 247. On July 3, 2008, Dr. McTernan noted that Plaintiff was also doing well with the anti-depressant bupropion (Wellbutrin). T. 247.

When Plaintiff saw Dr. McTernan on October 20, 2008, Plaintiff complained of some increased pain in the low back and recurrence of migraines. T. 245. However, she also reported that the pain "mostly went away." T. 245. Plaintiff reported that hydrocodone had helped her previously. Id. X-rays of Plaintiff's thoracic spine on October 20, 2008, revealed mild disc space narrowing and spurring at multiple disc space levels and osteopenia (low bone density).

T. 234. There was no evidence of bony fracture or destructive bony change. Id. X-rays of Plaintiff's lumbar spine on the same date revealed mild curvature of the mid-lumbar spine and osteopenia. Id. The lumbar spine x-rays were otherwise unremarkable. Id.

On December 4, 2008, McTernan noted "continued worsening" of Plaintiff's thoracic spinal symptoms and cited the recent x-ray. T. 244.

On or about December 15, 2008, Dr. McTernan completed an assessment at the request of the Erie County Department of Social Services. T. 253-54. Dr. McTernan stated that Plaintiff was very limited in certain functional areas, and could walk, stand, sit, push, pull, and bend for one to two hours. T. 254. Similarly, She could lift and carry ten pounds occasionally and climb stairs for one to two hours. Id. Dr. McTernan found that Plaintiff had no limitation in her ability to use public transportation, or her ability to see, hear, speak, and use her hands. Id. He indicated that Plaintiff was not able to perform work. Id.

**B.   Plaintiff's Mental Health Care Providers**

Ms. Nowak, a licensed mental health counselor, conducted an initial intake screening assessment of Plaintiff on March 29, 2007. T. 208-09, 211. Plaintiff stated that she was depressed for the past six months to one year and denied suicidal ideation. T. 208. Ms. Nowak observed that Plaintiff made good eye contact. Id. Plaintiff exhibited no evidence of hallucinations or delusions and

she was oriented to person, place, and time. Id. Plaintiff's thoughts were logical, coherent, and goal directed. Her memory was grossly intact. Id. Plaintiff was depressed and her affect was appropriate to her mood. Id. Ms. Nowak's impression was major depressive disorder, single episode, mild. Id. She rated Plaintiff's global assessment of functioning ("GAF") at 62. Id.[5]

Ms. Nowak saw Plaintiff for therapy sessions in April, May, and June 2007. T. 210-211. Plaintiff believed that her husband was the reason for her depression. T. 210.

On June 26, 2007, Dr. Dham Gupta evaluated Plaintiff. T. 207-08. Plaintiff stated that she had been taking Celexa for the past four months without relief. T. 207. Dr. Gupta found that Plaintiff's mood was somewhat dysphoric, with congruent affect. Id. Her memory was fair and her concentration was somewhat limited, and her cognition appeared to be at least average. Id. Dr. Gupta diagnosed Plaintiff's condition as: Axis I, major depressive disorder and anxiety disorder, not otherwise specified; Axis II, passive dependent personality disorder; Axis III, chronic severe

---

[5] The GAF scale indicates the clinician's overall judgment of a person's level of psychological, social, and occupational functioning. The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, ("DSM") 32, 34 (4th ed., text revision, 2000). A GAF score in the range of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social occupational, or school functioning, but generally suggests that the individual is functioning pretty well and has some meaningful interpersonal relationships. Id. at 34.

migraine headaches. Id. Dr. Gupta changed Plaintiff's medication from Celexa to Effexor. Id.

Ms. Nowak completed an assessment of Plaintiff's functional abilities on July 18, 2007. T. 212. She opined that Plaintiff had "fair" ability to remember work-like procedures and stated that Plaintiff had good ability to understand, remember and carry out very short and simple instructions. Id. She believed that Plaintiff's functioning was mainly impaired by a lack of energy and poor concentration due to depression and anxiety. T. 213.

Plaintiff had counseling sessions with Ms. Nowak from July through December 2007, T. 226-28, during which plaintiff discussed difficulties she had with her husband and the possibility of divorce. During these sessions, Plaintiff discussed difficulties she had with her husband and she discussed the possibility of divorce. On December 6, 2007, Ms. Nowak reported that Plaintiff appeared fairly happy and the tone of her speech was lighter. T. 227. Plaintiff's husband had been living out of the house recently, and Plaintiff had been enjoying being able to do the things she wanted to do. Id.

Plaintiff saw Dr. Gupta in August and November 2007. T. 221. In the interim she had missed four scheduled appointments. Id. On August 21, 2007 she reported that she was under a lot of stress. Id. When she returned on November 20, 2007, Plaintiff reported that she was not feeling depressed and that her anxiety was under much

better control. Dr. Gupta noted that overall, Plaintiff was doing very well. Id.

Plaintiff saw Dr. Gupta again in February, May, and August 2008. T. 220-21. On February 26, 2008, Plaintiff stated that she had stressors in her life including marital problems and having to take care of her elderly mother. T. 221. During that visit, Dr. Gupta observed that Plaintiff appeared unkempt and had strong body odor. T. 221. When he next saw Plaintiff on May 20, 2008, she was doing fairly well, although she had weight issues. T. 220. On August 26, 2008, Plaintiff told Dr. Gupta that she still became "somewhat depressed at times," and she was not sleeping well, but was also caring for her elderly mother during the night. Id.

Plaintiff continued to see Ms. Nowak from February through October 2008. T. 222-26, 251. On August 21, 2008, Plaintiff stated that she wanted to be more social with friends, but she lacked the energy. T. 223. On September 11, 2008, Plaintiff reported that she was "coping." T. 222. On October 22, 2008, Ms. Nowak commented that Plaintiff was able to laugh a couple of times and she became excited when she talked about her gardening and her tomatoes T. 251. During this time period, Plaintiff failed to show up for at least five appointments, and she received three "10 day letters." T. 223, 225, 251.

Dr. Gupta completed an assessment of Plaintiff's functional abilities on October 28, 2008. T. 229-30. He rated Plaintiff's

ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonably and lengthy periods as poor/none. T. 230. Dr. Gupta opined that Plaintiff had fair ability in the following areas: remembering work-like procedures; understanding, remembering and carrying out very short and simple instructions; maintaining attention for extended periods of two hour segments; maintaining regular attendance and being punctual within customary tolerances; and asking simple questions or requesting assistance. T. 229-30. Plaintiff had good ability in the following areas: carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; working in coordination with or proximity with others without being unduly distracted; dealing appropriately with supervisors; and getting along with coworkers and peers. T. 229-30. Plaintiff's treatment with Dr. Gupta and Ms. Nowak was terminated on January 6, 2009, because she failed to respond to the clinic's outreach efforts after she missed appointments. T. 249.

C.   **Consultative Examinations**

Dr. Fenwei Meng evaluated Plaintiff on April 5, 2007, who complained of migraine headaches for the last twenty years. T. 175. Plaintiff also reported that she had depression and a learning disability. Id. Dr. Meng observed that Plaintiff appeared to be in no acute distress, with normal gait and stance. T. 176. Plaintiff

could perform a full squat; get on and off the examination table independently; and get up from a chair without difficulty. Id. Plaintiff had full range of motion of her neck and back. T. 177. Straight leg raising was negative. Id. Plaintiff had full range of motion and full strength in her arms and legs. Id. Neurological examination was unremarkable. Id. Dr. Meng diagnosed Plaintiff's condition as migraine, depression, diet-controlled hypertension, and learning disability. Id. Dr. Meng stated that Plaintiff's cervical spine and lumbar spine were normal. He concluded that Plaintiff had no limitation walking, standing, and going up and down stairs. Id.

Renee Baskin, Ph.D., examined Plaintiff on April 5, 2007. T. 179-82. Plaintiff had no history of psychiatric hospitalization or outpatient psychiatric treatment, although she was scheduled to begin therapy. T. 179. On examination, Plaintiff was responsive and cooperative. T. 180. Plaintiff's manner of relating, social skills, and overall presentation were adequate. Id. Plaintiff would be able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks with supervision, and make appropriate decisions, though she may have difficulty dealing with stress. T. 182. Baskin concluded that Plaintiff's psychiatric problem should not in itself be significant enough to interfere with Plaintiff's ability to function on a daily basis. Id.

Dr. E. Kamin, a State Agency psychological consultant, reviewed available medical evidence and completed a Mental Residual Functional Capacity Assessment (Form SSA-4734-BK-SUP) on May 4, 2007. T. 197-99. Dr. Kamin stated that Plaintiff was able to maintain attention and concentration for a simple job, and that she was not disabled by her mild depression T. 199.

### III. __Plaintiff's Non-Medical Evidence__

Plaintiff was 53 years-old at the time of her hearing, and she completed the eighth grade. T. 29. She has prior work experience as a housekeeper. T. 101. Plaintiff complained of pain in her lower back, which traveled to her mid-back and occasionally bothered her right leg. T. 30. She also complained of headaches, which caused her to have to go to a dark room about four or five times a week. T. 33.

Plaintiff testified that she did not do much during the day and she spent much of her day lying down. T. 31, 33. She stated that her husband shopped and did most household chores, but she tried to do what she could. T. 32. Plaintiff told the consultative examiner that she could cook, clean, shop, and do laundry when she "felt up to it." T. 175, 181. She stated that her back hurt if she sat too long, and estimated that she could stand for about eight minutes, walk for about ten minutes, and lift about one-half gallon of liquid. T. 31, 32.

IV.  **The Decision of the Commissioner that Plaintiff was not disabled is supported by substantial evidence.**

For the reasons that follow, the Court finds that the Commissioner's decision is supported by substantial evidence in the record and should be affirmed.

### A.  Treating Source Evidence

Plaintiff first contends that the ALJ failed to give controlling weight to the opinions of her medical providers, Dr. Roth and Dr. McTernan, and her treating psychiatrist Dr. Gupta. Pl. Mem. (Dkt. No.  11) at 18.

The Commissioner's regulations provide that a treating physician's opinion is entitled to controlling weight if it is well-supported by other substantial evidence in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion ... that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)).

When deciding to assign a treating physician's opinion controlling weight, the ALJ must consider a number of factors including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. See 20 C.F.R. § 404.1527(c). The Second Circuit recently held that it does not require a "slavish recitation of each and every factor [provided in 20 C.F.R. § 404.1527(c)] where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, No 12-902-cv, 512 Fed. Appx. 67 (2d Cir. Feb. 21, 2013) (unpublished opinion).

As discussed below, the Court agrees with the ALJ's reasoning in weighing and rejecting the treating sources' medical opinions.

## 2. Dr. Roth and Dr. McTernan

The ALJ recited Dr. Roth's treatment notes from April and July 2007, indicating that Plaintiff had a mild learning disability with depression that caused significant problems, as well as chronic back pain, but Roth was uncertain as to "how this is limiting to her." T. 22, 214. The ALJ noted that Roth stated Plaintiff had limitations in standing, sitting, bending, and pushing, and had stable mental functioning with no significant limitations. The ALJ

referred to Dr. Roth's Functional Capacity Assessment, in which Dr. Roth concluded that Plaintiff could occasionally lift/carry ten pounds, and frequently lift/carry five pounds; Plaintiff could stand or walk less than two hours per day, sit one hour per day, had discomfort and fatigue in the upper extremities, and had to lie down three hours per eight hour period due to back pain. T. 22, 216. The ALJ accorded limited weight to Dr. Roth's statements as to the Plaintiff's limitations because they were "inconsistent with objective findings or any significant physical impairment." T. 22.

As the Commissioner correctly points out, Dr. Roth's own treatment notes do not support the degree of his assessed limitations. Comm'r Mem. (Dkt No. 19) at 18-19. During Plaintiff's visits with Dr. Roth in February, April, and July, 2007, Plaintiff reported no specific physical complaints, except for a stiffness in her back in the morning which improved when she moved around. T. 215. Prescribed medications and therapies (e.g., myofasical) yielded "good results" and appeared to manage Plaintiff's back pain and migraine headaches adequately. Id. Dr. Roth himself stated that he was unsure as to how Plaintiff's back pain limited her. T. 214. This, in addition to other significant evidence in the record, conflicts with Dr. Roth's restrictive physical assessment.

In a separate but related argument, Plaintiff avers that the ALJ failed to consider x-ray evidence showing thoracic spine

compression fractures,[6] to which Drs. Roth and McTernan attribute her constant complaints of back pain. Pl. Mem. 19. Plaintiff's contention overlooks the fact that Dr. McTernan opined that Plaintiff's obesity was an critical factor in her complaints of chronic back pain. While his treatment notes from November and December of 2008 indicate that "[it] does appear most of the pain is related to [T-10 fracture]" and  "recent x-rays show[ ] continued worsening," T. 244-45, he previously noted in May of the same year that a "good part of the problem is from her weight," and that weight loss would "take some strain off the back and help alleviate some of the pressure." T. 247. On October 20, 2008, he observed that Plaintiff was losing weight and "noted the pain mostly went away." T. 245. McTernan's notes are internally inconsistent and also do not support his functional assessment.

Notably, Plaintiff's most recent x-rays of her thoracic spine and lumbar spine in October 2008 revealed "degenerative disc space narrowing and spurring at multiple lower interthoracic disc space levels" and "mild left convexed mid-lumbar spine curvature" with no evidence of bony fracture or destructive bony change, and osteopenia with otherwise unremarkable lumbar spine. T. 234, 244. The x-rays, contrary to Plaintiff's assertion, do not support McTernan's assessment or a finding of disability.   The ALJ

---

[6] In evaluating Dr. Roth's and Dr. McTernan's treatment notes, the ALJ cited those exhibits in his decision which specifically reference Plaintiff's x-rays. T. 22-23.

therefore did not err in finding that McTernan's opinion was inconsistent with "reasonable signs and diagnoses, including objective imaging tests." T. 23.

The report of consultative examiner Dr. Meng also undermines the opinions of Drs. Roth and McTernan. On examination, Dr. Meng observed that Plaintiff appeared to be in no acute distress, had normal gait and stance, could perform a full squat, get on and off the examination table independently, and had a full range of motion of her neck and back. T. 176-77. Plaintiff's straight leg raise test was negative, and she had a full range of motion in her arms and legs as well as full strength in her arms and legs. T. 177. Neurological examination was unremarkable. Id. Dr. Meng noted that Plaintiff's cervical and lumbar spine were normal, and found no limitation with respect to her ability to sit, lift, carry, walk, stand, and go up and down stairs. Id.

Because Dr. Roth's and Dr. McTernan's opinions conflicted with other opinions of record, the ALJ did not err in denying controlling weight to Plaintiff's treating physicians. See Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (internal citations removed).

Accordingly, the Court finds that the ALJ properly gave less than controlling weight to the opinions of treating physicians Dr. Roth and Dr. McTernan.

### 2.   Dr. Gupta

Plaintiff next argues that the ALJ improperly rejected the opinion of Dr. Gupta regarding her mental functional abilities. Pl. 19-21.

In his decision, the ALJ stated that Dr. Gupta's determination of disability was not supported by "reasonable signs and diagnoses," and that it appeared to be based solely upon Plaintiff's subjective statements. T. 23.

The Court notes that the Commissioner need not grant controlling weight to a treating physician's opinion to the ultimate issue of disability, as this decision lies exclusively with the Commissioner. See 20 C.F.R. § 404.1527(d)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

The present record contains ample evidence that contradicts Dr. Gupta's opinion. Indeed, Dr. Gupta's own treatment notes, as well as those provided by Ms. Nowak, Plaintiff's social worker, indicate that Plaintiff's complaints of depression were largely situational and triggered by stressors, such as caring for her elderly mother, and her abusive marital relationship. T. 210, 220-21, 226-28. Moreover, Plaintiff showed marked improvement at her December 6, 2007 session with Ms. Nowak, during which she appeared to be fairly happy and exhibited a lighter tone. T. 227. At that

time, Plaintiff's husband had moved out of the house, and she reported enjoying being able to do things that she wanted to do. Id.

Likewise, during Plaintiff's visit on November 20, 2007, she told Dr. Gupta that she was not feeling as depressed and that her anxiety was under much better control. T. 221. Dr. Gupta noted that she was doing "very well" on that date and "fairly well" during Plaintiff's May 20, 2008 visit. T. 220. On August 26, 2008, Plaintiff told Dr. Gupta that she still became "somewhat depressed at times," and was not sleeping well, however she was also caring for her elderly mother during the night and could not afford to sleep. Id.

On several occasions, Plaintiff was observed by Ms. Nowak and Dr. Gupta as appearing unkept and showing symptoms of continuing depression. T. 221, 224. However, the record supports the ALJ's conclusion that  Plaintiff's good days and bad days correlate with her reports of having decreased or increased stressors in her home life.

Also contrary to Dr. Gupta's assessment, consultative examiner Dr. Baskin found that plaintiff's manner of relating, social skills, and overall presentation were adequate. T. 180. Plaintiff had appropriate eye contact, and she was oriented to person, time, and place, with clear sensorium. Id. Plaintiff's attention and concentration were "relatively intact," and her memory skills were

intact. T. 181. Dr. Baskin's assessment indicated that Plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks with supervision, make appropriate decisions, and relate adequately with others. T. 182. She opined that Plaintiff's psychiatric problem should not in itself be significant enough to interfere with Plaintiff's ability to function on a daily basis. Id. Additionally, Dr. Baskin's findings are consistent with Plaintiff's GAF score as provided by Ms. Nowak, which, at 62, indicates "some mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM at 34.

Dr. Kamin, who did not examine Plaintiff, reviewed the available medical evidence and concluded that Plaintiff was able to maintain attention and concentration for a simple job, and she was not disabled by her mild depression. T. 199. State agency psychological consultants are highly qualified experts in Social Security disability evaluation. 20 C.F.R. § 416.927(e)(2)(i). Thus, the opinions of consulting sources "may constitute substantial evidence if they are consistent with the record as a whole." Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 79 (N.D.N.Y. 2005) (citing Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir.

1983); <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996); <u>SSR</u> 96-6p). Such is the case here.

For all of the above reasons, the ALJ properly evaluated treating source evidence, and the Commissioner's determination is supported by substantial evidence.

**B.    Medical Vocational Rules**

Plaintiff next argues that the ALJ improperly applied Medical-Vocational Guidelines ("Grids"). Specifically, given that Plaintiff's mental impairments resulted in solely nonexertional limitations, the ALJ erred by relying on the Grids as a framework for a finding of "not disabled," instead of calling on a vocational expert to testify as to whether there was work in the national economy that Plaintiff could perform. Pl. Mem. 22-24.

In this regard, the Second Circuit has held that the appropriateness of applying "the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis." <u>Bapp v. Bowen</u>, 802 F.2d at 605; see 20 C.F.R. § 404.1566(e) (Commissioner has discretion whether to use vocational expert). Generally speaking, the ALJ must consult with a vocational expert where the claimant's nonexertional limitations "significantly limit the range of work permitted by h[er] exertional limitations...." <u>Id.</u> (quoting <u>Blacknall v. Heckler</u>, 721 F.2d 1179, 1181 (9th Cir. 1983)).

> However, the "mere existence of a
> nonexertional impairment does not

> automatically ... preclude reliance on the guidelines." <u>Id.</u> at 603. A nonexertional impairment "significantly limit[s]" a claimant's range of work when it causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." <u>Id.</u> at 605-06.

<u>Zabala v. Astrue</u>, 595 F.3d 402, 410-11 (2d Cir. 2010).

In this case, the ALJ determined that Plaintiff's age, education, work experience, and RFC allowed for unskilled work at all exertional levels with little to no interaction with the public. The ALJ noted that Plaintiff's ability to perform work at all exertional levels was compromised by nonexertional limitations, but concluded that these restrictions would have little or no effect on the occupational base of unskilled work. T. 24. As discussed above, there is substantial evidence in the record to support these findings. Thus, under the regulations, rulings and case law referred to herein, the ALJ properly relied on the Grids as a framework for decisionmaking, without consulting with a vocational expert, to satisfy the Commissioner's burden at the final step of the sequential evaluation to show that there exists work in the national economy that Plaintiff can perform. <u>See</u> <u>Zabala</u>, 595 F.3d at 410-11; <u>Bapp</u>, 802 F.2d at 605-06.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. No. 10) is denied, and the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 18) is granted. The Complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           May 15, 2014